IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARNELL HART,                    )
                                 )
        Plaintiff,               )        Civil No. JFM- 00-3466
                                 )
    v.                           )
                                 )
GIANT FOOD INC., et al.,         )
                                 )
        Defendants.              )
_____)

## MEMORANDUM

Plaintiff Darnell Hart ("Hart") has brought this action under federal law against

Defendant Giant Food, Inc. ("Giant") for employment discrimination. He asserts claims for race

discrimination, religious discrimination, and disability discrimination. He also asserts claims

under state law for breach of contract and wrongful discharge. Discovery has been completed,

and Giant has moved for summary judgment. The motion will be granted.

I.

Hart, an African American, was employed by Defendant Giant for 17 years. Hart worked

as a grocery clerk from 1992 to 1996. As a grocery clerk, one of Hart's main responsibilities was

to stock cases of groceries on the shelves. From 1992 through 1996, Hart was formally

disciplined five times by Giant.

In 1994, Hart suffered a back injury. As a result, Hart was put on a medical restriction by

his doctor, Martin Kanner. Giant accommodated his restriction by putting him on light duty and

assigning him the lightest cases to stack. In August of 1996, Dr. Kanner changed Hart's

1

restriction by increasing the amount he could lift to 75 pounds, the amount he could push/pull to 200 pounds, and the amount of time he could stand without a break to three hours. Giant took Hart off light duty but continued to accommodate his Doctor's restriction by assigning him cases less than 75 pounds.

Hart fell well short of Giant's production standard for stocking shelves. Giant expected grocery clerks to stock between 34 and 36 cases per hour. During October and November of 1996, Hart routinely failed to stock above 100 cases during an entire eight hour shift. Hart was given verbal and written warnings concerning his poor work performance. In late October, at Giant's request, Dr. Kanner confirmed that Hart's medical restriction was appropriate. On November 1, Hart was suspended for poor job performance. After returning from his suspension, Hart's performance did not improve. Hart stated that 25 to 30 pounds was the most he could lift despite his Doctor's statement that he could lift up to 75 pounds. On November 9th, Hart was terminated for poor job performance.

Hart filed a charge against Giant with the Equal Employment Opportunity Commission ("EEOC"). In March 1997, the parties reached a Negotiated Settlement Agreement ("Agreement"). Under the agreement, Giant was to reinstate Hart with a 75 pound lifting restriction. Immediately after the Agreement was reached, Hart submitted a new restriction from his doctor. This restriction limited Hart to lifting 40 pounds. Because Hart was unable to fulfill the Agreement, Giant refused to rehire Hart.

In addition, Hart requested that he not be assigned work on Saturday night or Sunday morning so he could honor his Sabbath. Giant respected this request until 1992. Hart alleges that on several occasions in 1992 and 1993, Giant refused to honor his request and scheduled him

2

for work on Saturday night.

## II.

Hart alleges that he injured his back and that Giant refused to reasonably accommodate him. To establish a prima facie case of discrimination under the ADA, Hart must show that (1) he has a disability; (2) he is otherwise qualified for the job; and (3) his disability played a motivating role in the employment decision. See, e.g., Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999).

Hart has not established the second of these elements, which is that he was otherwise qualified for the job.[1] Hart is otherwise qualified if, "with or without reasonable accommodation [he] can perform the essential functions" of his job. Cleveland v. Policy Management System Corp., 526 U.S. 796, 806 (1999). One of the essential functions of the grocery clerk position is to stock shelves. Hart fell well short of Giant's production standard for stocking shelves. Giant expected grocery clerks to stock between 34 and 36 cases per hour. During October and November of 1996, Hart routinely failed to stock above 100 cases during an entire eight hour shift.

Hart's doctor, Dr. Kanner, restricted Hart's ability to work by requiring him to not lift more than 75 pounds, not push or pull more than 200 pounds, and to take a break after standing for more than three hours. Giant accommodated these restrictions. On October 16th, Hart claimed that, despite the accommodations, his back injury was still preventing him from completing the work. On October 31st, Dr. Kanner wrote a letter to Giant stating that Hart's

---

[1] Giant argues that he has not established the first and third elements as well. I need not consider these arguments.

3

current restrictions were satisfactory. Giant's accommodations were reasonable, and Hart has not presented any evidence concerning other possible accommodations.

Hart was unable to stock shelves, an essential job function, within Giant's performance standard. Hart was unable to perform despite Giant's reasonable accommodations. Whether, despite reasonable accommodations, Hart was unable to perform because of his back injury or some other reason is irrelevant. See Martinson v. Kinney Shoe Corp., 104 F.3d 683, d686-689 (4th Cir. 1997). In Martinson, a shoe salesman was fired because seizures caused by his epilepsy left him unable to perform an essential job function. The court held that he was legally fired even though his disability directly caused his inability to perform. Id. (reasonable accommodations were not possible). Martinson governs here, and it is fatal to Hart's ADA claim.

### III.

To establish a prima facie case for disparate treatment under Title VII, Hart must show: (1) he is a member of a protected class; (2) his conduct was comparable to that of an employee outside of the protected class; and (3) he was treated differently from the other employee. See, e.g., Taylor v. Virginia Union University, 193 F.3d 219, 234 (4th Cir. 1999) (en banc).[2]

### A.

Hart claims that he was discriminated against with respect to work assignments,

---

[2] Hart asserts many of his discrimination claims under 42 U.S.C. § 1981 as well as Title VII. The elements of proof are the same under both statutes. See Causey v. Balog, 162 F.3d 795, 804 (4th Cir. 1998). Hart also asserts claims under 42 U.S.C. §§ 1985 and 1986. These claims fail for the same reasons as do Hart's underlying substantive claims. Moreover, he has made only conclusory allegations that an unlawful conspiracy existed. This is insufficient. See Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995).

discipline, and the denial of his transfer. These claims do not constitute adverse employment

decisions. Adverse employment decisions involve ultimate employment decisions such as

hiring, promoting, compensating, and discharging. <u>See Mackey v. Shalala</u>, 43 F. Supp.2d 559,

568-69 (D. Md. 1999).

A change in work assignments, such as a transfer, that does not involve a change in pay.

benefits, hours, or level of responsibilities does not constitute an adverse employment decision.

<u>See id.</u>; <u>Tuggle-Owens v. Shalala</u>, 2000 WL 783071, at *8 (D. Md.) ("Mere inconvenience to an

employee or an alteration in job responsibilities of an employee do not constitute adverse

employment actions.") Hart's claim that he was given different work assignments because of his

race does not constitute adverse employment action. The type of work an employee is assigned

may, for example, be part of a constructive discharge claim or provide support for a hostile work

environment claim. But, standing alone, a work assignment is not an ultimate employment

action.

The denial of a purely lateral transfer that does not involve a promotion is not an adverse

employment action. <u>See McMillon v. Corridan</u>, 1999 WL 729250, at *3-4 (E.D. La.). The

denial of Hart's transfer request does not constitute an adverse employment action.

Mere disciplinary action against an employee does not constitute adverse employment

action. <u>See Porter v. National Con-Serv, Inc.</u>, 51 F. Supp.2d 656, 658 (D. Md. 1998); <u>Tuggle-</u>

<u>Owens</u>, 2000 WL 783071, at *9. So long as discipline does not involve the essential terms,

conditions, or benefits of plaintiff's employment, discipline is not an ultimate employment

decision. <u>See Tuggle-Owens</u>, 2000 WL 783071, at *9. Hart does not allege that the disciplinary

actions taken against him directly changed the essential terms, conditions, or benefits of his

employment. Therefore, the disciplinary actions taken against Hart are not adverse employment actions.[3]

B.

In addition, Hart has failed to identify similarly situated employees who were treated differently than he was in regard to his claims for transfer denial, work assignments, and discipline. In his deposition, Hart made conclusory statements that he was treated differently from other employees. These statements often did not involve specific dates, times, people, or circumstances. See, e.g., Byrd v. Safeway, Inc., 2000 WL 964773, at *4 (D. Md.); Fisher v. Maryland Dep't of Housing & Community Dev., 32 F. Supp.2d 257, 262 (D. Md. 1998). Conclusory, vague statements are not sufficient evidence to overcome a motion for summary judgment. See, e.g., Fischer, 32 F. Supp.2d at 262. Moreover, during his deposition Hart often contradicted his allegations of disparate treatment stating that he was not aware of the amount of work other employees were assigned. See, e.g., Hart Dep. at 300.

The only specific example Hart offers of disparate treatment involved Donald Beard ("Beard"). Hart claims that Beard, who was Caucasian, was treated better when he was while on light duty following an injury. However, Beard was injured more than 10 years before Hart. Further, Beard, who worked in produce, and Hart, who was working as a grocery clerk at the time of his injury, were on different assignments at the time of their injuries. Also, their stores and supervisors were different. Given these factors, Beard was not similarly situated to Hart.

---

[3] Of course, Hart was eventually fired, in part based on the disciplinary actions taken against him. Discharge is an adverse employment action, and the disciplinary actions taken against Hart, although not distinct adverse employment actions, can be considered within his claim for discharge.

Therefore, Hart cannot use Beard's experience to satisfy his prima facie case.

C.

Hart also claims that his employment was terminated because of his race in violation of Title VII.[4]  Assuming Hart has satisfied his prima facie case, he has not presented sufficient evidence to demonstrate that Giant's reason for discharging him - his poor performance - was pretextual.  Hart bears the burden of proof on that issue.  See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

The only evidence that Hart has produced to show that he is performing well are his own statements.  However, the perception of the employer is what matters, not the perception of the employee.  See, e.g., Beall v. Abbott Labs., 130 F.3d 614, 620 (4th Cir. 1997).  As already discussed, Giant has demonstrated that Hart was not meeting its objective performance standards. Indeed, in trying to support his ADA claim, Hart admits that he was unable to complete all of his work.  See Hart Dep. at 345-46.

D.

Hart also asserts a hostile work environment claim.  To establish such a claim, Hart must prove: (1) that the conduct was unwelcome; (2) that the harassment was based on race; (3) that the harassment was severe and pervasive; and (4) that some basis exists for imputing liability to the employer.  See Smith v. Allied Systems, LTD., 2000 WL 708909, at *4-5 (D. Md.); Carter v. Ball, 33 F.3d 450, 461 (4th Cir. 1994).  Assuming that Hart has established the first, third, and

---

[4] Giant also contends that Hart's termination claim, like his hostile work environment and retaliation claims, should not be considered because they were not asserted until Hart filed his summary judgment opposition.  I need not consider that contention because I find that all of the claims fail on the merits.

fourth prongs, he has not shown, as he is required to do, that "but for" his race, he would not have been harassed. Smith, 2000 WL 708909, at *4-5.

### E.

Hart next claims retaliation. To establish a prima facie case of retaliation, Hart must show: (1) he engaged in a protected activity; (2) Giant took adverse action against him; and (3) there was a causal connection between the two. See Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 443 (4th Cir. 1998). Assuming Hart has met the first two prongs, he has failed to establish any causal connection between the alleged protected activity and adverse action taken against him. He has come forward with no direct evidence of causation. Further, he has not presented evidence of any particular activity in which he engaged and specific acts of retaliation allegedly taken in response. Without such evidence, no inference based upon timing can be drawn. See Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998).

### IV.

Hart's final federal claim is for religious discrimination. A plaintiff seeking to establish a religious discrimination claim for failure to accommodate under Title VII must show that: (1) he has a bona fide religious belief that conflicts with an employment requirement; (2) he informed Giant of this belief; and (3) he was disciplined for failure to comply with the employment requirement. See Chalmers v. Tulon Co. of Richmand, 101 F.3d 1012, 1019 (4th Cir. 1996).

Hart requested to not work on Saturday nights and Sunday mornings in order to observe his Sabbath. Hart was occasionally assigned to work Saturday night shifts, and, at least on one occasion, he was disciplined for failing to work that shift. See Opp. at 8. Giant does not dispute that Hart has satisfied his prima facie case. Therefore, the burden shifts to Giant to show that it

could not accommodate Hart's request without undue hardship. See Chalmers, 101 F.3d at 1019.

Giant responds that it could not accommodate Hart without violating its seniority system. See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 79 (1977). However, in his deposition, Hart claims that on December 28, 1992, when Hart was disciplined for not working on his Sabbath, Clem Wilmore offered to work for him. See Hart at 265-269; Ex 47. This offer was denied by Hart's manger, Nick Sacchetti. Wilmore was working part time, and Giant has not produced any evidence showing how accommodating Hart on that occasion would have violated their seniority system.

However, even if Hart can establish a case of religious accommodation, his claim is time-barred. Under Title VII, Hart had a maximum of 300 days from the date of the allegedly discriminatory act to file with the EEOC. See Leskinen v. UTZ Quality Foods, Inc., 30 F. Supp.2d 530, 532-33 (D. Md. 1998). The alleged religious discrimination violations occurred in 1992 and 1993. Hart filed his EEOC charge on religious discrimination in 1997, more than 300 days later. The continuing violation doctrine cannot be invoked to resurrect these claims because Hart has not proven that any religious discrimination happened within the time period or that Giant had an express, openly espoused policy of religious discrimination. See Redding v. Anne Arundel County, Maryland, 996 F. Supp. 488, 490 (D. Md. 1998) (plaintiff must show either serial or systemic discrimination).

V.

Hart asserts two claims for breach of contract. The first arises from a Negotiated Settlement Agreement entered into between Hart and Giant. Hart and Giant entered into the

9

Agreement to settle Hart's EEOC charge. See Exhibit 51. Under the Agreement, Hart would return to work at Giant and Giant would accommodate Hart by not requiring him to lift more than 75 pounds. Afterwards, Hart's doctor ordered him to not lift more than 40 pounds. Because Hart could not fulfill his obligations as an employee, Giant terminated him. The contract is unambiguous. Giant was only required to accommodate a 75 pound lifting restriction. Giant did not have to accommodate a 40 pound lifting restriction. Therefore, Giant did not breach the Agreement by refusing to accommodate a 40 pound lifting restriction.

Hart's second breach of contract claim arises from the termination of his employment. Hart has not specified what contract has been breached, and he has presented no evidence in support of his claim. Therefore, Giant is entitled to summary judgment as to it.

VI.

Hart's final claim is for wrongful discharge under Maryland law. To state a claim for wrongful discharge, Hart must show that Giant fired him in contravention of a clear mandate of public policy. See Orci v. Insituform E., Inc., 901 F. Supp. 978, 982 (D. Md. 1995); Chappell v. Southern Md. Hosp., Inc., 578 A.2d 766, 768-71 (Md. 1990). The purpose of the tort of wrongful discharge is to vindicate a public policy in the absence of any possible civil remedy. Chappell, 578 A.2d at 768-71. As a result, a tort for wrongful discharge does not exist if a statute provides a remedy for vindicating the public policy at issue. See id. "Preclusion . . . applies only when the public policy sought to be vindicated is expressed in a statute which carries its own remedy for vindicating that public policy." Insignia Residential Corp. v. Ashton, 755 A.2d 1080, 1086 (Md. 2000); Makovi v. Sherwin-Williams Co., 561 A.2d 179, 182 (Md. 1989).

10

Makovi held that federal and Maryland anti-discrimination laws create a public policy to prevent discrimination in employment settings and create a civil remedy to vindicate that public policy. Id. at 182. Therefore, wrongful discharge suits for employment discrimination are generally precluded. See id. In contrast, in Insignia, a woman employee was fired for refusing to have sex with her employer under circumstances that would have amounted to prostitution. Insignia held that a wrongful discharge action was not precluded because Maryland's anti-prostitution statutes created a clear public policy but did not create a cause of action. Id. at 1086. The present case is controlled by Makovi, not Insignia. As Makovi held, federal and Maryland anti-discrimination statutes create a public policy and a remedy for vindicating that public policy. Hart has not pointed to a statute that creates a relevant public policy without a civil remedy. Therefore, his wrongful discharge claim is precluded.

A separate order effecting the rulings made in this opinion is being entered herewith.

Date: November 27, 2000

J. Frederick Motz
United States District Judge

11